## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **K.E.,** | : | **CIVIL ACTION NO. 1:15-CV-1634** |
| | : | |
| **PLAINTIFF** | : | **(Chief Judge Conner)** |
| | : | |
| **v.** | : | |
| | : | |
| **DOVER AREA SCHOOL** | : | |
| **DISTRICT**, *et al.*, | : | |
| | : | |
| **Defendants** | : | |

## MEMORANDUM

Plaintiff K.E. advances civil rights claims pursuant to 42 U.S.C. § 1983 and Title IX of the Education Amendments of 1972 ("Title IX"), 20 U.S.C. § 1681(a), against her former school district, intermediate unit, and teacher. K.E. additionally asserts Pennsylvania state law claims for assault, battery, and intentional inflection of emotional distress. Before the court are motions for summary judgment filed by defendants Dover Area School District ("the District")[1] and Lincoln Intermediate Unit 12 ("Lincoln").[2]

---

[1] Doc. 61.
[2] Doc. 64.

# I.    <u>Factual Background & Procedural History</u>[3]

The factual and procedural predicate of this litigation is well known to the parties and the court.  A truncated version of that history will suffice for purposes of the instant motions.  This matter is a civil rights action concerning allegations that a male music teacher sexually assaulted a female student, K.E., over the course of four years, causing her to become pregnant at the age of thirteen.  K.E. is no longer a minor.[4]  The court refers to K.E. by her initials due to the sensitive nature of the claims and her status as a minor during the period of the alleged assaults.[5]

For purposes of these motions, the court credits K.E.'s testimony that the sexual abuse took place while K.E. attended school in the District and at Lincoln.[6]

---

[3] Local Rule 56.1 requires that a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 be supported "by a separate, short, and concise statement of the material facts, in numbered paragraphs, as to which the moving party contends there is no genuine issue to be tried."  LOCAL RULE OF COURT 56.1.  A party opposing a motion for summary judgment must file a separate statement of material facts, responding to the numbered paragraphs set forth in the moving party's statement and identifying genuine issues to be tried.  <u>Id.</u>  Unless otherwise noted, the factual background herein derives from the parties' Rule 56.1 statements of material facts.  <u>See</u> Docs. 63, 65, 70, 72, 85, 87.  To the extent the parties' statements are undisputed or supported by uncontroverted record evidence, the court cites directly to the statements of material facts.  K.E. filed enumerated responses to the District's and Lincoln's statements, <u>see</u> Docs. 70, 72, but included 66 additional paragraphs styled as "Plaintiff's Statement of Additional Facts" in each response.  Neither Federal Rule of Civil Procedure 56 nor Local Rule 56.1 authorizes these filings, and K.E. did not request leave of court to file them.  The District also runs afoul of Local Rule 56.1 by merely summarizing the depositions in this case.  <u>See</u> Doc. 63.  Notwithstanding these deficiencies, the court has thoroughly reviewed the parties' statements and has independently considered the entire record.
[4] Doc. 65 ¶ 1; Doc. 72 ¶ 1.
[5] <u>See</u> Doc. 65 ¶ 6; Doc. 72 ¶ 6; <u>see also</u> LOCAL RULE OF COURT 5.2(d)(2).
[6] <u>See</u>, <u>e.g.</u>, Doc. 63 ¶ 192; Doc. 65 ¶ 8.

The District denies contemporaneous knowledge of the assaults. Lincoln contends that its actions after learning of the assaults were adequate under the law.

K.E. reported to school staff on two separate occasions that defendant Matthew Puterbaugh ("Puterbaugh"), a music teacher in the District, sexually abused her.[7] K.E. made the first report during the 2002-2003 school year when she was in eighth grade at the District's intermediate school.[8] She informed two teachers, Maria Ann Kann ("Kann") and Barbara Ann Caroline Della-Croce Eshenour ("Eshenour"), that Puterbaugh had kissed and touched her.[9] These teachers referred K.E. to a guidance counselor, Johanna Ruth Humphreys ("Humphreys").[10] Both Eshenour and Kann felt that they had a duty to report allegations of abuse to Humphreys, despite their lack of knowledge concerning a policy on handling reports of abuse.[11]

Humphreys' account of K.E.'s visit to her office conflicts with K.E.'s description of what transpired. Humphreys testified that she met with K.E.

---

[7] Doc. 63 ¶¶ 55, 78, 102-08, 127-29, 171-79; Doc. 65 ¶¶ 3, 20-27; Doc. 70 ¶¶ 55, 78, 102-08, 127-29, 171-79; Doc. 72 ¶¶ 3, 20-27; Doc. 84, K.E. Dep. 7:9-9:15, 28:14-29:21, May 2, 2016 ("K.E. Dep.").

[8] Doc. 63 ¶¶ 53-55, 71, 78, 171; Doc. 70 ¶¶ 53-55, 71, 78, 171; K.E. Dep. 7:9-8:1.

[9] Doc. 63 ¶¶ 55, 78, 171; Doc. 70 ¶¶ 55, 78, 171; Doc. 77, Kann Dep. 14:17-17:9, June 15, 2016 ("Kann Dep."); Doc. 78, Eshenour Dep. 30:20-31:14, 44:2-23, July 14, 2016 ("Eshenour Dep."); K.E. Dep. 7:9-8:22.

[10] Doc. 63 ¶¶ 59, 80, 172-73; Doc. 70 ¶¶ 59, 80, 172-73. The parties also refer to Humphreys by her married surname, Pass. See Doc. 76, Humphreys Dep. 5:12-6:2, Sept. 30, 2016 ("Humphreys Dep.").

[11] Doc. 63 ¶¶ 58, 81-83; Doc. 70 ¶¶ 58, 81-83; Eshenour Dep. 48:6-9; Kann Dep. 19:4-17. The court notes that the District had a formal written policy concerning child abuse allegations at the time of K.E.'s report. Doc. 70-1 at 67-82. Kann and Eshenour testified that they were unaware of the existence of such a policy. Eshenour Dep. 16:19-17:9, 50:15-19; Kann Dep. 19:15-22.

following Eshenour and Kann's report, but that K.E. did not tell Humphreys anything about Puterbaugh's inappropriate conduct.[12]  Humphreys also testified that notwithstanding K.E.'s supposed refusal to speak with her, she reported the allegations to the school principal, Ken Walter.[13]  *Per contra*, K.E. testified that she provided Humphreys with the same information about Puterbaugh's abusive conduct that she had reported to Eshenour and Kann.[14]  K.E. also testified that Humphreys responded that these allegations were serious, that Puterbaugh was a "nice guy," and that he could be terminated from his job.[15]  According to K.E., Humphreys warned her that no one would believe her and discouraged K.E. from pursuing a report.[16]

K.E. again reported abuse by Puterbaugh during November 2004 when she was in tenth grade and assigned to Lincoln's emotional support classroom within the District's high school.[17]  K.E. approached her teacher, Grace Wesley ("Wesley"), and conveyed that K.E. had a "relationship" with Puterbaugh.[18]  Wesley took K.E.

---

[12] Doc. 63 ¶¶ 33-34, 42-43.

[13] Doc. 63 ¶ 44.

[14] Id. ¶ 173; Doc. 70 ¶ 173.

[15] Doc. 63 ¶ 174; Doc. 70 ¶ 174; K.E. Dep. 13:22-14:12.

[16] Doc. 63 ¶ 175; Doc. 70 ¶ 175; K.E. Dep. 14:13-15:5, 15:22-16:3, 74:6-77:20.  The District suggests that K.E. "changed her story" concerning her interaction with Humphreys, claiming that "K.E. . . . later admitted that [Humphreys] did not tell her that no one would believe her."  Doc. 63 ¶ 175.  This assertion finds no support in the record.  Indeed, K.E.'s deposition testimony flatly contradicts this assertion. K.E. Dep. 13:8-16:3, 76:7-77:20.

[17] Doc. 65 ¶¶ 4-5, 10, 20; Doc. 72 ¶¶ 4-5, 10, 20; K.E. Dep. 28:14-23; see Doc. 81.

[18] Doc. 63 ¶ 177; Doc. 70 ¶ 177; Doc. 81 at 4; see also Doc. 65 ¶ 20; Doc. 72 ¶ 20; K.E. Dep. 28:14-29:5.

to see a guidance counselor, Lisa St. Clair ("St. Clair").[19] K.E. told St. Clair that Puterbaugh had abused her during private music lessons.[20] K.E. also told St. Clair that she would deny her report if it would result in Puterbaugh losing his job.[21] St. Clair informed the principal of Dover High School of the report and called K.E.'s mother.[22] K.E.'s mother testified that neither the District's nor Lincoln's staff contacted her.[23]

After meeting with St. Clair, K.E. returned to Wesley's classroom.[24] She commented to Wesley that she was "going to hate her" and that K.E. "didn't want [Puterbaugh] to lose his job."[25] These statements concerned Wesley, who then contacted Lincoln's Assistant Director, Lynne Spangler ("Spangler").[26] Spangler instructed Wesley to document her concerns and send them to Spangler directly.[27] Wesley's subsequent fax to Spangler states, in pertinent part:

> Tuesday, 11/2/04
>
> [K.E.] was upset. She called him (Mr. Puterbaugh) and told him that she had told officials about their relationship. She asked him what he thought. She said his response was: "I think I better look for a new job."

---

[19] Doc. 63 ¶ 105; Doc. 65 ¶¶ 22-23; Doc. 70 ¶ 105; Doc. 72 ¶¶ 22-23. The parties also refer to St. Clair by her maiden surname, DiSanto. See Doc. 80, St. Clair Dep. 5:7-13, Sept. 30, 2016 ("St. Clair Dep."). K.E. does not recall speaking with St. Clair. K.E. Dep. 141:19-142:7.

[20] Doc. 63 ¶¶ 126-28; Doc. 65 ¶¶ 24-26; Doc. 70 ¶¶ 126-28; Doc. 72 ¶¶ 24-26.

[21] Doc. 63 ¶ 129; Doc. 65 ¶ 27; Doc. 70 ¶ 129; Doc. 72 ¶ 27.

[22] Doc. 63 ¶¶ 131-32; Doc. 65 ¶¶ 28-29; Doc. 70 ¶¶ 131-32; Doc. 72 ¶¶ 28-29; St. Clair Dep. 15:10-12.

[23] Doc. 83, S.E. Dep. 119:23-120:19, July 14, 2016.

[24] Doc. 63 ¶ 107; Doc. 65 ¶ 30; Doc. 70 ¶ 107; Doc. 72 ¶ 30.

[25] Doc. 63 ¶ 107; Doc. 65 ¶ 30; Doc. 70 ¶ 107; Doc. 72 ¶ 30.

[26] Doc. 63 ¶ 112; Doc. 65 ¶¶ 31-32; Doc. 70 ¶ 112; Doc. 72 ¶¶ 31-32.

[27] Doc. 63 ¶ 113; Doc. 65 ¶ 33; Doc. 70 ¶ 113; Doc. 72 ¶ 33.

> She was contemplating lying about what happened—
> saying nothing happened—because she didn't want him
> to leave.
>
> I counselled her "to tell the truth," no matter how painful.
>
> Wednesday, 11/3/04
>
> [K.E.] went to see Ms. [St. Clair] first period. When she
> came to 3rd period, she asked me if I would hate her if she
> told me something. I assured her that I wouldn't. She
> continued on and said that she told Mr. Miller, the
> assistant principal, that she lied about the relationship. I
> said, "Did you?" She said, "No, I don't want him to have
> to leave."[28]

Spangler forwarded this statement to Dr. Richard Nilsen ("Nilsen"), the District's superintendent.[29] Spangler also reported this information to Child and Youth Services.[30]

There is no evidence that Child and Youth Services or Nilsen investigated K.E.'s report.[31] Law enforcement did not learn of Puterbaugh's conduct until April, 2013.[32] Following additional complaints against Puterbaugh and an ensuing criminal investigation, Puterbaugh pled guilty to involuntary deviate sexual intercourse arising from his abuse of K.E on June 30, 2015.[33]

---

[28] Doc. 81 at 4-5. K.E. does not recall speaking with Assistant Principal Shane Miller. K.E. Dep. 142:8-144:6.

[29] Doc. 65 ¶ 36; Doc. 72 ¶ 36; see Doc. 81 at 2; see also Spangler Dep. 53:8-54:22. Partial transcripts of Spangler's deposition are filed by the parties at numerous, separate docket entries. Unless otherwise noted, the court will cite to this deposition *passim* as "Spangler Dep." without docket entry citations.

[30] Doc. 65 ¶ 37; Doc. 72 ¶ 37.

[31] See Doc. 63 ¶¶ 114, 138-39; Doc. 65 ¶ 38; Doc. 70 ¶¶ 114, 138-39; Doc. 72 ¶¶ 37-38.

[32] Doc. 44 ¶ 26; Doc. 45 ¶ 26.

[33] Doc. 44 ¶¶ 27-33; Doc. 45 ¶¶ 27-33; Doc. 46 ¶¶ 32-33.

K.E. commenced this action against the District, Lincoln, Nilsen, and Puterbaugh on August 24, 2015,[34] subsequently filing an amended complaint[35] on August 26, 2015. The District, Lincoln, and Nilsen filed motions to dismiss[36] and the court dismissed several of K.E.'s claims and dismissed Nielsen as a defendant.[37] K.E. filed a second amended complaint[38] on June 7, 2016. Therein, K.E. asserts the following claims: *first*, that certain policies, customs, and practices maintained by the District and Lincoln violated her Fourteenth Amendment rights to security of person, due process, and equal protection pursuant to 42 U.S.C. § 1983 (Count I); *second*, that the District and Lincoln violated her Fourteenth Amendment right to due process by affirmatively placing her in a position of danger (Count II); and *third*, that the District and Lincoln discriminated against her on the basis of gender in violation of Title IX (Count III).[39] She also reasserts her constitutional claims under Section 1983 and state law claims for assault, battery, and intentional infliction of emotional distress against Puterbaugh (Counts IV-VI).[40] Lincoln and the District now move for summary judgment on Counts I through III of the second amended complaint.[41] The motions are fully briefed and ripe for disposition.

---

[34] Doc. 1.
[35] Doc. 4.
[36] Docs. 21, 22.
[37] Docs. 39, 40.
[38] Doc. 44.
[39] Id. ¶¶ 37-50.
[40] Id. ¶¶ 51-59.
[41] Docs. 61, 64.

## II.   Legal Standard

Through summary adjudication, the court may dispose of those claims that do not present a "genuine dispute as to any material fact" and for which a jury trial would be an empty and unnecessary formality.[42]  The burden of proof tasks the non-moving party to come forth with "affirmative evidence, beyond the allegations of the pleadings," in support of its right to relief.[43]  This evidence must be adequate, as a matter of law, to sustain a judgment in favor of the non-moving party on the claims.[44]  Only if this threshold is met may the cause of action proceed.[45]

## III.   Discussion

### A.   Statute of Limitations

As a threshold matter, defendants collectively argue that Pennsylvania's two-year statute of limitations for personal injury actions bars K.E.'s claims in the instant matter.[46]  K.E. remonstrates that Pennsylvania law tolls the statute of limitations for actions arising from childhood sexual abuse for twelve years after the minor reaches the age of eighteen.[47]  K.E. was 26 when she commenced the instant action.[48]

---

[42] FED. R. CIV. P. 56(a).

[43] Pappas v. City of Lebanon, 331 F. Supp. 2d 311, 315 (M.D. Pa. 2004); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

[44] Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-57 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-89 (1986).

[45] See Pappas, 331 F. Supp. 2d at 315.

[46] Doc. 62 at 3; Doc. 66 at 4; see 42 PA. STAT. & CONS. STAT. ANN. § 5524(7).

[47] Doc. 71 at 3; Doc. 73 at 3; see 42 PA. STAT. & CONS. STAT. ANN. § 5533(b)(2).

[48] K.E. Dep. 5:8-14; see Doc. 1.

The Pennsylvania infancy tolling statute provides:

> (i) If an individual entitled to bring a civil action arising from childhood sexual abuse is under 18 years of age at the time the cause of action accrues, the individual shall have a period of 12 years after attaining 18 years of age in which to commence an action for damages regardless of whether the individual files a criminal complaint regarding the childhood sexual abuse.
>
> (ii) For the purposes of this paragraph, the term "childhood sexual abuse" shall include . . . sexual activities between a minor and an adult, provided that the individual bringing the civil action engaged in such activities as a result of forcible compulsion or by threat of forcible compulsion which would prevent resistance by a person of reasonable resolution[.][49]

Defendants posit that the phrases "forcible compulsion" and "arising from childhood sexual abuse" indicate that tolling applies only to claims against the individuals who perpetrate abuse, not third parties who facilitate or fail to intervene.[50]

We reject defendants' argument. Section 5533 does not place a specific limitation on the type of defendant against whom the tolling provision applies.[51] We find Viney v. Jenkintown School District, 51 F. Supp. 3d 553 (E.D. Pa. 2014), to be instructive. In Viney, a former student brought constitutional claims against a school district based on its failure to investigate abuse she suffered while a minor.[52]

---

[49] 42 PA. STAT. & CONS. STAT. ANN. § 5533(b)(2)(i)-(ii).
[50] Doc. 62 at 4-8; Doc. 66 at 6-8.
[51] See 42 PA. STAT. & CONS. STAT. ANN. § 5533(b)(2)(i)-(ii).
[52] Viney, 51 F. Supp. 3d at 554.

The perpetrator was an employee of the school district.[53]  The school district raised the same defense the District submits herein, to wit: that the two-year statute of limitations bars plaintiff's claims because the infancy tolling statute does not apply to third party defendants.[54]  The court rejected this defense, stating that the key language in the infancy tolling statute describing claims that are tolled—"a civil action arising from childhood sexual abuse"—merely identifies that a causal connection must exist between the civil action and the childhood sexual abuse.[55]

We agree with our sister court's *ratio decidendi*.  There is an obvious casual connection between the abuse K.E. suffered and her charges against the District and Lincoln *sub judice*, qualifying her claims as "arising from childhood sexual abuse."[56]  K.E. filed suit prior to her thirtieth birthday.[57]  Therefore, her claims are timely under Pennsylvania law.

### B.  Merits

The District and Lincoln seek judgment on three of K.E.'s claims, namely: Count I, a Fourteenth Amendment municipal liability claim under <u>Monell v. Department of Social Services</u>, 436 U.S. 658 (1978), pursuant to Section 1983; Count II, a Fourteenth Amendment claim under the state-created danger doctrine pursuant to Section 1983; and Count III, a Title IX claim.  The court will address these claims *seriatim*.

---

[53] <u>Id.</u>
[54] <u>See</u> <u>id.</u> at 554-55.
[55] <u>Id.</u> at 555-56.
[56] <u>See</u> 42 Pa. Stat. & Cons. Stat. Ann. § 5533(b)(2)(ii); <u>see</u> <u>also</u> <u>Viney</u>, 51 F. Supp. 3d at 556.
[57] K.E. Dep. 5:8-14; <u>see</u> Doc. 1.

1.     *Section 1983 Claims*

Section 1983 of Title 42 of the United States Code provides a cause of action to redress violations of federal law committed by state officials.[58] Section 1983 is not a source of substantive rights, but merely a method for vindicating those rights otherwise protected by federal law.[59] To establish a claim under Section 1983, plaintiff must show a deprivation of a "right secured by the Constitution and the laws of the United States . . . by a person acting under color of state law."[60] There is no dispute that the moving defendants are state actors within the purview of Section 1983.

a.     **_Monell_ Policy or Custom Theory**

Municipalities and other local government entities may not be held liable in a Section 1983 suit for conduct of their employees under a theory of *respondeat superior* or vicarious liability.[61] Municipal liability only arises when a government causes an employee to violate another's constitutional rights by an official custom or policy.[62] To establish liability under Monell, a plaintiff must identify the

---

[58] See 42 U.S.C. § 1983.

[59] Gonzaga Univ. v. Doe, 536 U.S. 273, 284-85 (2002); Kneipp v. Tedder, 95 F.3d 1199, 1204 (3d Cir. 1996).

[60] Kneipp, 95 F.3d at 1204 (quoting Mark v. Borough of Hatboro, 51 F.3d 1137, 1141 (3d Cir. 1995)).

[61] Bd. of Cty. Comm'rs of Bryan Cty. v. Brown, 520 U.S. 397, 403 (1997) (citing Monell, 436 U.S. at 692); see also Colburn v. Upper Darby Twp., 946 F.2d 1017, 1027 (3d Cir. 1991).

[62] Monell, 436 U.S. at 690-94; see also Montgomery v. De Simone, 159 F.3d 120, 126 (3d Cir. 1998).

challenged policy or custom, attribute it to the public entity itself, and show a causal link between the execution of the policy or custom and the injury suffered.[63]

A policy exists "when a decisionmaker possess[ing] final authority to establish . . . [public] policy with respect to the action issues an official proclamation, policy or edict."[64] A custom is "an act 'that has not been formally approved by an appropriate decisionmaker,' but that is 'so widespread as to have the force of law.'"[65] A plaintiff may also establish a policy or custom when a policymaker has failed to take affirmative action despite an obvious need to correct the "inadequacy of existing practice which is so likely to result in the violation of constitutional rights" that inaction exhibits deliberate indifference to the need.[66]

The latter theory is relevant *sub judice*. K.E. asserted various <u>Monell</u> claims in her first amended complaint, which the court categorized as failure-to-train and failure-to-act theories of liability at the motion to dismiss stage.[67] K.E. reasserts the same claims in her second amended complaint.[68] Specifically, K.E. contends that the District and Lincoln were deliberately indifferent to the need, *first*, to train

---

[63] <u>See</u> <u>Natale v. Camden Cty. Corr. Facility</u>, 318 F.3d 575, 583-84 (3d Cir. 2003).

[64] <u>Id.</u> at 584 (quoting <u>Kneipp</u>, 95 F.3d at 1212).

[65] <u>Id.</u> (quoting <u>Bryan Cty.</u>, 520 U.S. at 404).

[66] <u>Id.</u> (quoting <u>Bryan Cty.</u>, 520 U.S. at 417-18).

[67] Doc. 39 at 12.

[68] Doc. 44 ¶¶ 37-41. Defendants also argue against negligent retention and failure to discipline theories, as well as an equal protection claim. Doc. 62 at 15 n.7, 16; Doc. 66 at 13-14. K.E. does not posit negligent retention and failure to discipline theories in her second amended complaint, nor does she plead a traditional equal protection claim. Doc. 44 ¶¶ 37-41, 45-50.

employees to detect and report sexual abuse, and *second*, to respond to reports of abuse.[69]

A government entity exhibits deliberate indifference when it "disregard[s] a known or obvious consequence of [its] . . . action."[70] Failure to train amounts to deliberate indifference when it causes a pattern of cognate constitutional violations.[71] Under exceptional factual circumstances, a single incident which is the "obvious consequence of failing to provide" training may also serve to demonstrate deliberate indifference.[72] Alleged training deficiencies must closely relate to the constitutional injury.[73] The failure-to-act theory of liability is also governed by the foregoing principles.[74]

In cases involving student sexual assault, a school district's failure to train its employees to detect or report signs of abuse may constitute deliberate indifference if the plaintiff establishes a pattern of causally-connected employee violations.[75] Similarly, a school district's inaction subsequent to one or more reports of sexual

---

[69] Id. ¶¶ 39-40.

[70] Connick v. Thompson, 563 U.S. 51, 61 (2011); see Vargas v. City of Phila., 783 F.3d 962, 974 (3d Cir. 2015).

[71] See Connick, 563 U.S. at 62; Kelly v. Borough of Carlisle, 622 F.3d 248, 265 (3d Cir. 2010).

[72] Connick, 563 U.S. at 63; see Kelly, 622 F.3d at 265-66.

[73] City of Canton v. Harris, 489 U.S. 378, 391 (1989); Beck v. City of Pittsburgh, 89 F.3d 966, 971-72 (3d Cir. 1996).

[74] See Berg v. Cty. of Allegheny, 219 F.3d 261, 276 (3d Cir. 2000); M.S. *ex rel.* Hall v. Susquehanna Twp. Sch. Dist., 43 F. Supp. 3d 412, 424-25 (M.D. Pa. 2014).

[75] See Kline *ex rel.* Arndt v. Mansfield, 255 F. App'x 624, 629-30 (3d Cir. 2007) (nonprecedential); Douglas v. Brookville Area Sch. Dist., 836 F. Supp. 2d 329, 364 (W.D. Pa. 2011).

abuse conveyed directly to school officials may also manifest deliberate indifference.[76]

### i. *The District*

A reasonable jury could conclude that the District was deliberately indifferent when handling K.E.'s reports of abuse. K.E. submits several instances when school officials were made aware of inappropriate touching and abuse allegations against Puterbaugh. In late 2000, a female student complained that Puterbaugh made her and other female students uncomfortable by engaging in conduct such as "rubbing their legs, rubbing their backs," and "blocking departure."[77] The District investigated and sent Puterbaugh a letter, indicating that the matter was "resolved."[78] Then, twice between 2002 and 2004, K.E. reported abuse to Humphreys and Wesley; both ultimately informed school officials of K.E.'s statements concerning Puterbaugh's abuse.[79]

Record evidence also indicates that the District failed to train teachers regarding how to handle sexual abuse allegations.[80] It is undisputed that, upon learning of K.E.'s initial allegations, the District did not formally investigate Puterbaugh.[81] K.E. presents affirmative evidence that District policymakers were

---

[76] See Kline, 255 F. App'x at 628 (quoting Black by Black v. Indiana Area Sch. Dist., 985 F.2d 707, 712-13 (3d Cir. 1993)); Stoneking v. Bradford Area Sch. Dist., 882 F.2d 720, 725 (3d Cir. 1989); e.g., Doe v. Boyertown Area Sch. Dist., 10 F. Supp. 3d 637, 650-51 (E.D. Pa. 2014); C.M. v. Se. Delco Sch. Dist., 828 F. Supp. 1179, 1184 (E.D. Pa. 1993).
[77] Doc. 70-1 at 60.
[78] Id. at 65.
[79] See Doc. 81; Humphreys Dep. 25:20-25:25; K.E. Dep. 7:9-16:3, 28:14-29:21.
[80] Eshenour Dep. 16:6-17:9, 48:6-9; Kann Dep. 10:16-11:15, 19:4-17.
[81] See, e.g., K.E. Dep. 24:6-24:25; St. Clair Dep. 36:6-37:1.

aware of multiple student reports concerning Puterbaugh's abusive conduct. These multiple reports were more than sufficient to put the District on notice of its need to take action and train its employees to protect K.E. and others.

The District offers a divergent account. The District maintains that policymakers were unaware of any "credible" reports of abuse against Puterbaugh, discrediting both the 2000 investigation into Puterbaugh as well as K.E.'s reports.[82] The District further avers that it had an appropriate policy for investigating sexual abuse and that District staff followed this policy.[83]

Notwithstanding its litigation self-assessment, the District cannot ignore testimony from its own employees—Humphreys, Eshenour, Kann, and Spangler. K.E. reported abuse to Humphreys, Eshenour, and Kann, and her report to Wesley reached Spangler. Humphreys testified that she informed the school principal, a policymaker, of K.E.'s allegations.[84] Kann and Eshenour testified that they were never aware of an official District policy on reporting child abuse, nor did they receive training anent child abuse investigations.[85] Spangler faxed K.E.'s allegations to the District's superintendent, Nilsen, another policymaker.[86] This evidence flatly contradicts the District's narrative.

---

[82] Doc. 62 at 12-14. The court notes with interest that despite the District's remonstrations that K.E. was not a "credible" reporter of abuse, the District nonetheless deemed her credible enough to ask Puterbaugh to stay away from K.E. Id. at 24.

[83] Id. at 13.

[84] Humphreys Dep. 25:22-25.

[85] Eshenour Dep. 16:6-17:9, 48:6-9; Kann Dep. 11:2-15, 19:4-17.

[86] Doc. 81 at 2.

Moreover, K.E. testified that Humphreys pressured her to recant her report.[87] The District predicates its defense on a blatantly inaccurate characterization of K.E.'s testimony. The District baldly asserts that K.E. "changed her story" during her deposition testimony and "admitted" that Humphreys "did not tell her that no one was going to believe her."[88] K.E. testified in pertinent part:

> Q.     Okay. I just want to make sure I understand. During your conversation with [Humphreys], she never said, because you've lied before about where you've been while you skipped class, no one is going to believe you about the allegations you're making about Mr. Puterbaugh?
>
> A.     Not in those direct words.
> Q.     Okay. Then tell me what the direct words were that [Humphreys] said to you that made you believe that no one would believe you about Mr. Puterbaugh.
>
> A.     She had told me—and I don't know word for word [because] it's been a while. **But I do remember she had told me that these are very serious allegations and because I had made—I—that I got in a lot of trouble a lot in school that it's going to be hard for people to believe me.**[89]

It is simply erroneous to suggest that this testimony reflects that there is "no evidence that Dover officials ever pressured K.E. to recant her allegations."[90] K.E.'s

---

[87] K.E. Dep. 14:13-15:5, 15:22-16:3, 74:6-77:20.
[88] Doc. 63 ¶ 175; see Doc. 62 at 12-15, 19 n.8.
[89] K.E. Dep. 76:17-77:17 (emphasis added).
[90] Doc. 62 at 13 n.4.

testimony that Humphreys convinced her that no one would believe her further supports her failure-to-train and failure-to-act theories of liability.[91]

Multiple disputes of material fact exist, despite the District's asseverations to the contrary. K.E.'s testimony alone precludes Rule 56 judgment for the District. K.E.'s Section 1983 claims based on <u>Monell</u> liability are for a jury, not the court, to decide.[92]

### ii. *Lincoln*

The record evidence as pertains to Lincoln's conduct compels a different result. None of the staff at Lincoln convinced K.E. to recant her allegations against Puterbaugh.[93] To the contrary, staff members seriously considered her allegations, called her mother, and reported their observations to both Child and Youth Services and the District.[94]

K.E. rejoins that Lincoln did not follow up with the District and did not initiate a formal investigation into Puterbaugh.[95] K.E. also maintains that Lincoln's sexual abuse reporting policy during the relevant time period was out of compliance with Pennsylvania law.[96] K.E. contends that these circumstances give rise to a

---

[91] K.E. and the District dispute whether K.E.'s interaction with Humphreys alone could give rise to a single-incident deliberate indifference <u>Monell</u> claim. Doc. 62 at 15-16; Doc. 71 at 12-13. As K.E. demonstrates that her claim is based on at least two, if not three, incidents, the court declines to comment on the sufficiency of K.E.'s first report for a single-incident claim.

[92] <u>See</u> <u>Stoneking</u>, 882 F.2d at 725.

[93] <u>See</u> K.E. Dep. 28:14-29:21, 140:4-144:23.

[94] Doc. 81; St. Clair Dep. 31:3-32:25; Spangler Dep. 53:8-24.

[95] Doc. 73 at 6-8.

[96] <u>Id.</u>

single-incident <u>Monell</u> claim.[97]  But Lincoln acted affirmatively to protect K.E. by

reporting the abuse to the District.[98]  Its policy was not so inadequate as to "likely []

result in the violation of constitutional rights."[99]  K.E. also has not demonstrated

that Lincoln engaged in a pattern of inaction anent student reports of abuse.[100]

Even taking K.E.'s testimony as true, her evidence is insufficient to withstand

Lincoln's Rule 56 challenge.  The court will therefore grant summary judgment to

Lincoln on Count I.

> **b.**  **State-Created Danger Theory**

When the affirmative exercise of state authority either causes injury to a

citizen or leaves a citizen more vulnerable to injury at the hands of a third party, the

government contravenes the substantive due process protections of the Fourteenth

Amendment.[101]  This principle of liability is commonly referred to as the "state-

created danger" theory.[102]  In order to establish a state-created danger claim, a

plaintiff must prove:

> (1) that the harm ultimately caused to the plaintiff was
> foreseeable and fairly direct; (2) the state actor acted in
> willful disregard for the plaintiff's safety; (3) there was
> some relationship between the state and the plaintiff; and
> (4) the state actor used his authority to create an
> opportunity for danger that otherwise would not have
> existed.[103]

---

[97] <u>Id.</u> at 9-10.
[98] <u>See</u> Doc. 81.
[99] <u>Natale</u>, 318 F.3d at 584.
[100] <u>See</u> <u>Kline</u>, 255 F. App'x at 629-30.
[101] <u>See</u> <u>Bright v. Westmoreland Cty.</u>, 443 F.3d 276, 281 (3d Cir. 2006) (quoting <u>Schieber v. City of Phila.</u>, 320 F.3d 409, 416 (3d Cir. 2003)).
[102] <u>See</u> <u>id.</u>
[103] <u>Rivas v. City of Passaic</u>, 365 F.3d 181, 194 (3d Cir. 2004) (citing <u>Kneipp</u>, 95 F.3d at 1208).

An action undertaken with "willful disregard" for the safety of a student is one that shocks the conscience.[104] With respect to the fourth element, liability is "predicated upon the state's *affirmative acts* which work to [a plaintiff's] detriment in terms of exposure to danger."[105] This element is not satisfied unless a plaintiff proves "but for" causation.[106]

### i.    *The District*

The District submits, as it did at the Rule 12(b)(6) stage, that K.E. has not specified any affirmative action by the District which would have caused K.E. to be more vulnerable than she otherwise would have been.[107] The District also argues that K.E's harm was unforeseeable and that the District did not willfully disregard K.E.'s safety in a manner that shocks the conscience.[108]

The court notes that these arguments are grounded in the same inaccurate interpretation of K.E.'s testimony discussed *supra*. K.E. avers that the District engaged in an affirmative act—dissuading her from pursuing her report of abuse—that increased her risk of harm.[109] We noted in our previous opinion that this alleged conduct augmented K.E.'s vulnerability to further harm from Puterbaugh.[110] Assuming *arguendo* that K.E.'s testimony is true, depriving K.E. of recourse by discouraging reporting demonstrates the District's willful disregard for K.E.'s

---

[104] Sanford v. Stiles, 456 F.3d 298, 304 (3d Cir. 2006).
[105] Bright, 443 F.3d at 282 n.6 (quoting D.R. by L.R v. Middle Bucks Area Vocational Tech. Sch., 972 F.2d 1364, 1374 (3d Cir. 1992)) (emphasis added).
[106] Kaucher v. Cty. of Bucks, 455 F.3d 418, 433 (3d Cir. 2006).
[107] Doc. 62 at 19.
[108] Id. at 20-24.
[109] Doc. 71 at 14-15; see K.E. Dep. 13:13-16:3.
[110] See Doc. 39 at 17.

safety.[111]  Continued abuse was a foreseeable outcome,[112] and improperly pressuring a student to recant, if true, certainly shocks the conscience.[113]  Drawing all inferences in favor of K.E., a jury could reasonably find that Humphreys took this affirmative action as a direct result of the District's failure to train employees on handling sexual abuse allegations discussed *supra*.  Humphreys contradicts K.E.'s account, creating an impassable dispute of material fact.[114]  Hence, the court will deny the District's motion for summary judgment on Count II.

### ii.     *Lincoln*

We again reach a different conclusion regarding Lincoln.  The record does not evince that Lincoln engaged in an "affirmative act" that put K.E. at risk.  As noted *supra*, no staff at Lincoln discouraged K.E. from reporting.[115]  Any failure on Lincoln's part to follow up with the District concerning K.E.'s allegations is not an affirmative act.[116]  K.E. cannot prove the fourth element required for the state-created danger theory of liability.  The court will grant Lincoln summary judgment on Count II.

### 2.     *Title IX Claim*

Title IX proscribes discrimination, exclusion, or denial of benefits on the basis of sex in educational institutions or programs which receive federal funding.[117]

---

[111] See K.E. Dep. 13:8-16:3, 74:6-77:20.
[112] See Rivas, 365 F.3d at 194-95.
[113] See Sanford, 456 F.3d at 309-11.
[114] Humphreys Dep. 23:10-24:25; see also FED. R. CIV. P. 56(a).
[115] See K.E. Dep. 28:14-29:21, 140:4-144:23.
[116] See Bright, 443 F.3d at 282.
[117] 20 U.S.C. § 1681.

The Supreme Court has recognized an implied private right of action thereunder,[118] as well as a monetary damage remedy in such private actions.[119] To succeed on a Title IX sexual harassment claim, a plaintiff student must show: (1) *quid pro quo* sexual harassment, or a sexually hostile educational environment; (2) actual notice to an "appropriate person" who has the authority to institute corrective measures; and (3) a response to the harassment that amounts to deliberate indifference.[120]

Under Title IX, an appropriate person "is, at a minimum an official of the recipient entity with authority to take corrective action to end the discrimination."[121] A school principal will ordinarily be an appropriate person for purposes of Title IX notice.[122] However, any official with "authority to supervise a teacher and to investigate a complaint of misconduct" may qualify, even if he or she is not permitted to terminate or suspend employees.[123] The job responsibilities of each purported appropriate person must be evaluated during the period relevant to the claim.[124]

An appropriate person must have actual knowledge of the misconduct and fail to respond.[125] Knowledge of the mere possibility of harassment is insufficient,

---

[118] See Cannon v. Univ. of Chi., 441 U.S. 677 (1979).

[119] See Franklin v. Gwinnett Cty. Pub. Sch., 503 U.S. 60, 75-76 (1992).

[120] Bennett v. Pa. Hosp. Sch. of Nurse Anesthesia, No. 01-CV-4098, 2002 WL 32341792, at *3 (E.D. Pa. Oct. 29, 2002) (citing Gebser v. Lago Vista Indep. Sch. Dist., 524 U.S. 274, 291-92 (1998)); see Bostic v. Smyrna Sch. Dist., 418 F.3d 355, 359 (3d Cir. 2005).

[121] Gebser, 524 U.S. at 290.

[122] See Warren *ex rel.* Good v. Reading Sch. Dist., 278 F.3d 163, 171 (3d Cir. 2002).

[123] Id. at 173.

[124] See id. at 170, 172-73.

[125] See Bostic, 418 F.3d at 362; Warren, 278 F.3d at 173-74.

but an appropriate person need not be absolutely certain that harassment has occurred in order to satisfy the knowledge requirement.[126]  Actual knowledge exists if the school was aware of underlying facts that indicated "sufficiently substantial danger to students."[127]

An official decision not to remedy any type of discrimination demonstrates deliberate indifference.[128]  A clearly unreasonable response to actual notice of harassment also amounts to deliberate indifference.[129]

### a.    **The District**

The District contends that no "appropriate person" had "actual knowledge" of K.E.'s exigent circumstances.[130]  The District notes that a guidance counselor is not an "appropriate person" under Title IX.[131]  The District also avers that K.E. cannot prove deliberate indifference as the District lacked knowledge of her circumstances.[132]

Humphreys' testimony gainsays these averments.  She testified that she related K.E.'s allegations to the District's middle school principal.[133]  St. Clair also testified that she related K.E.'s charges to the District's high school principal.[134]

_____

[126] See Dawn L. v. Greater Johnstown Sch. Dist., 586 F. Supp. 2d 332, 367 (W.D. Pa. 2008) (citing Bostic, 418 F.3d at 360).
[127] Bostic, 418 F.3d at 361 (quoting 3C FED. JURY PRAC. & INSTR. § 177.36 (5th ed. 2001)).
[128] Id. at 360.
[129] Chancellor v. Pottsgrove Sch. Dist., 501 F. Supp. 2d 695, 708 (E.D. Pa. 2007).
[130] Doc. 62 at 25-26.
[131] Id. at 25 n.12.
[132] Id. at 26-27.
[133] Humphreys Dep. 25:22-25.
[134] St. Clair Dep. 34:11-36:23.

Documentary evidence demonstrates that Nilsen, the District's superintendent, likewise received notice of K.E.'s report.[135]  Two principals and a superintendent are clearly "appropriate" people for purposes of Title IX, as all had supervisory authority over Puterbaugh.[136]  K.E.'s allegations signaled that Puterbaugh was a substantial danger to students.[137]  K.E. submits that the principals and Nilsen failed to take any action in response to knowledge of Puterbaugh's abusive conduct.[138]  A jury could find on this record that the District's answer to K.E.'s reports—to do nothing—was "clearly unreasonable."[139]  Viewed in the light most favorable to K.E., the *probata* fits squarely into the elements necessary for a Title IX claim.  The court will deny the District's motion for summary judgment on Count III.

### b. <u>Lincoln</u>

Lincoln argues that it cannot be held liable under Title IX because no "appropriate person" at Lincoln maintained supervisory authority over Puterbaugh.[140]  K.E. does not respond to this argument in her briefing.[141]  Hence, K.E. has effectively waived any objection to Lincoln's argument that no "appropriate person" existed at Lincoln.[142]  Even if K.E. had not waived her opposition, the court would nevertheless agree with Lincoln.  Title IX assumes the existence of an "appropriate person" with supervisory authority over the employee

---

[135] Doc. 81 at 2.
[136] <u>See</u> <u>Warren</u>, 278 F.3d at 171, 173.
[137] K.E. Dep. 7:9-9:9, 11:11-13:5, 28:14-29:21; <u>see</u> <u>Bostic</u>, 418 F.3d at 361.
[138] Doc. 71 at 18-19.
[139] <u>Chancellor</u>, 501 F. Supp. 2d at 708-09.
[140] Doc. 66 at 19.
[141] Doc. 73 at 13-15.
[142] <u>See</u> <u>D'Angio v. Borough of Nescopeck</u>, 34 F. Supp. 2d 256, 265 (M.D. Pa. 1999).

against whom allegations have been levied.[143]  Puterbaugh was never affiliated with

Lincoln, only the District.[144]  K.E.'s Title IX claim against Lincoln necessarily fails.

The court will grant Lincoln summary judgment on Count III.

**IV.**  **Conclusion**

The court will deny the District's motion[145] for summary judgment and will

grant Lincoln's motion[146] for summary judgment.  An appropriate order shall issue.


 /S/ CHRISTOPHER C. CONNER
Christopher C. Conner, Chief Judge
United States District Court
Middle District of Pennsylvania



Dated:    September 29, 2017

---

[143] See Warren, 278 F.3d at 171-73.
[144] Doc. 65 ¶¶ 3-5; Doc. 72 ¶¶ 3-5.
[145] Doc. 61.
[146] Doc. 64.